**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| JESSICA TAVARES; DOLLY SUEHEAD; DONNA CAESAR; BARBARA SUEHEAD, *Petitioners-Appellants*, | No. 14-15814 |
| | D.C. No. 2:13-cv-02101-TLN-CKD |
| v. | |
| GENE WHITEHOUSE; CALVIN MOMAN; BRENDA ADAMS; JOHN WILLIAMS; DANNY REY, in their official capacity as members of the Tribal Council of the United Auburn Indian Community, *Respondents-Appellees*. | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Troy L. Nunley, District Judge, Presiding

Argued and Submitted March 15, 2016
San Francisco, California

Filed March 14, 2017

Before: M. Margaret McKeown, Kim McLane Wardlaw,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge McKeown
Partial Concurrence and Partial Dissent by Judge Wardlaw

## SUMMARY[*]

### Indian Civil Rights Act

The panel affirmed the district court's dismissal for lack of jurisdiction of a habeas corpus petition brought under the Indian Civil Rights Act and dismissed three petitioners' appeals as moot.

The panel held that a tribe's temporary exclusion of its own members from tribal land, but not the entire reservation, did not constitute a "detention" under 25 U.S.C. § 1303, and the district court therefore lacked jurisdiction to review the tribal members' temporary exclusion claim. The panel held that the withholding of the petitioners' per capita tribal distributions also did not create habeas jurisdiction under the ICRA.

The panel dismissed on mootness grounds the appeal of three petitioners whose exclusion orders had expired.

Concurring in part and dissenting in part, Judge Wardlaw agreed with the majority that the court lacked habeas jurisdiction over the withholding orders and that the appeals of three petitioners should be dismissed as moot. Judge Wardlaw concluded, however, that the fourth petitioner's ten-year banishment order severely restrained her liberty and constituted "detention" under the ICRA.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Andrew W. Stroud (argued) and Landon D. Bailey, Hanson Bridgett LLP, Sacramento, California; Fred J. Hiestand, Esq., Sacramento, California; for Petitioners-Appellants.

Elliot R. Peters (argued), Steven A. Hirsch, Jo W. Golub, and Jesse Basbaum, Keker & Van Nest LLP, San Francisco, California, for Respondents-Appellees.

**OPINION**

McKEOWN, Circuit Judge:

This appeal tests the limits of federal court jurisdiction to hear a habeas petition brought under the Indian Civil Rights Act ("ICRA"), 25 U.S.C. §§ 1301–1303, where the underlying claim arises not from an actual detention or imprisonment, but instead from a tribe's temporary exclusion of its own members.[1]

Congress enacted the ICRA in 1968 in response to a "long line" of federal court decisions exempting Indian tribes from constitutional restraints. *See* Cohen's Handbook of Federal Indian Law § 1.07, at 97 (Nell Jessup Newton ed., 2012) [Cohen's]; *see also Michigan v. Bay Mills Indian Cmty.*, 134

---

[1] The parties dispute whether the petitioners were temporarily "banished" or temporarily "excluded." We use the term "exclusion," but ascribe no special significance to the word. *See* Patrice H. Kunesh, *Banishment as Cultural Justice in Contemporary Tribal Legal Systems*, 37 N.M. L. Rev. 85, 88 n.17 (noting that "exclusion" and "banishment" are often used interchangeably).

S. Ct. 2024, 2030, 2037 (2014) (noting that Indian tribes possess a "special brand of sovereignty" that predates, and is consequently not bound by, the Constitution). The Act extended to tribes most (but not all) of the civil protections in the Bill of Rights. *See* David H. Getches et al., Federal Indian Law 380–81 (6th ed. 2011). The ICRA created a new federal habeas remedy "to test the legality of . . . detention by order of an Indian tribe." 25 U.S.C. § 1303. Because § 1303 provides the exclusive federal remedy for tribal violations of the ICRA, unless a petitioner is in "detention by order of an Indian tribe," the federal courts lack jurisdiction over an ICRA challenge and the complaint must be brought in tribal court. *See Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 65, 67 (1978).

The question here is whether a temporary exclusion from tribal land, but not the entire reservation, constitutes a detention under the ICRA. Reading the ICRA's habeas provision in light of the Indian canons of construction and Congress's plenary authority to limit tribal sovereignty, we hold that the district court lacked jurisdiction under § 1303 of the ICRA to review this temporary exclusion claim.

## BACKGROUND

Before the first Europeans arrived in California, as many as 350,000 Indians lived within the state's borders, speaking up to eighty different languages. S. Rep. No. 103-340, at 1 (1994). By the time Mexico ceded California to the United States in 1848, the indigenous population had dropped to approximately 150,000 people; by 1900, it had plummeted to about 15,000. *Id.* at 1–2. This decline was not, of course, unique to California, but instead mirrored the effects of

disease, war, and removal policies on tribes across the country.

One of the indigenous groups still in California at the turn of the century was the Auburn Band, "a small, cohesive band of Indians" that lived about forty miles outside of Sacramento. *Id.* at 4. By 1953, the federal government had acquired forty acres of land (the "Auburn Rancheria" or "Rancheria") in trust on the Band's behalf. *Id.* But by the mid-1950s, Congress adopted a policy of "assimilation through termination," Cohen's § 1.06, at 85, and the Auburn Rancheria was ultimately terminated in 1967. S. Rep. No. 103-340, at 5. As a result, "[R]ancheria lands formerly held in tribal or community ownership" were divided and distributed. H.R. Rep. No. 103-812, at 22 (1994).

The Tribe's history is a microreflection of congressional seesawing on tribal governance over the past century. The so-called Termination Era of the 1950s saw Congress end the "historic relationships" between specified tribes and the federal government, defund federal tribal assistance programs, and give named states civil and criminal jurisdiction over individual Indians with an option for other states to assume such jurisdiction. Cohen's § 1.06, at 91. It was in this context that the Rancheria was terminated.

But blowback to the "disastrous results" of termination came swiftly, and by the 1960s, the federal government had adopted a policy of strengthening tribal self-government and self-determination. *Id.* § 1.07, at 94. This shift in focus led Congress to "enact[] special acts restoring a substantial number of previously terminated tribes," *id.* § 1.07, at 97, including the Auburn Indian Restoration Act in 1994, 25 U.S.C. § 1300*l*–1300*l*-7.

Today, the historic Band is known as the United Auburn Indian Community ("UAIC" or "Tribe"). The UAIC owns twelve parcels of land on the historic Rancheria, including a preschool, a community service center, foster homes, and recreational facilities. It also owns off-Rancheria facilities, including the Thunder Valley Casino Resort. The remaining twenty-one parcels of land on the Rancheria are privately owned, not tribally owned or controlled.

In keeping with the goals of current federal Indian policy, the Tribe is self-governing. It is run by an elected five-member Tribal Council, which enacts legislation and takes executive action. The Council also disciplines tribal members for civil violations of the Tribe's constitution and ordinances. Like many tribes today, the UAIC does not have a criminal code and does not exercise criminal jurisdiction over its members.

The Tribe adopted a constitution and bylaws, three of which are particularly implicated by this appeal. Ordinance 2004-001 III(B) imposes a duty on all tribal members "to refrain from damaging or harming tribal programs or filing of false information in connection with a tribal program." Ordinance 2004-001 III(I) requires members to "refrain from defaming the reputation of the Tribe, its officials, its employees or agents outside of a tribal forum[.]" And the Enrollment Ordinance provides that a Tribe member can be punished—up to and including disenrollment—for making misrepresentations against the Tribe.

This appeal arises out of actions taken by the Tribal Council in 2011. Petitioners Jessica Tavares, Dolly Suehead, Donna Caesar, and Barbara Suehead (collectively, "the petitioners") disagreed with how the Council was governing

internal tribal affairs and, on November 7, 2011, they submitted a recall petition to the Tribe's Election Committee.[2]  The recall petition raised a litany of allegations against the members of the Council: financial mismanagement, retaliation, electoral irregularity, denial of due process, denial of access to an audit, and restrictions on access to Tribe members' mailing addresses.  The Election Committee rejected the recall petition after determining that it did not have signatures from forty percent of tribal members, some of the signatures were not notarized, and some signatories did not provide a date and address, as required by a tribal ordinance.[3]

Around the same time, the petitioners circulated to mass media outlets two press releases detailing their complaints. The first press release stated that the Council had engaged in "questionable financial practices" and "cover-ups of financial misdealings," that the Council had "fraudulently" refused to conduct a financial audit of the Tribe's resources, and that the Tribe's elections were "dishonest and rigged."  After the Election Committee denied the recall petition, the petitioners circulated the second press release, which alleged that the Council had "scuttle[d]" the petition.

---

[2] Under the Tribe's constitution, "[u]pon receipt of a petition signed by at least forty percent (40%) of the qualified voters of the [UAIC], it shall be the duty of the Election Committee established by this Constitution to call and conduct within thirty (30) days an election to consider the recall of an elected official."

[3] The petitioners claim that the petition did in fact have signatures from forty percent of the Tribe and that they had no notice of the other requirements.  This dispute is not before us; we take no position on which version of the facts is true.

Four days after the recall petition was rejected, the Council sent each petitioner a Notice of Discipline and Proposed Withholding of Per Capita. The Notices stated that the petitioners' press releases "contained numerous inaccurate, false and defamatory statements" that wound up being published in non-tribal news outlets like the *Sacramento Bee*. The Notices informed the petitioners that, through the press releases, the petitioners had "[r]epeatedly libel[ed] and slander[ed] the Tribe and its agents maliciously and in disregard of the truth in non-tribal forums" and had taken "[h]armful and damaging actions to tribal programs, specifically our tribal businesses and government, and provid[ed] outsiders with false information about tribal programs," in violation of tribal law. The Notices also stated that the Council had voted to withhold the petitioners' per capita distributions and to ban them temporarily from tribal lands and facilities.

The exclusion orders were effective immediately. The petitioners were barred from tribal events, properties, offices, schools, health and wellness facilities, a park, and the casino. During their terms of exclusions, the petitioners could not run for tribal office, but they could vote in tribal elections through absentee ballots. They were not excluded from the twenty-one privately owned parcels of land, including their own homes and land owned by other members of the Tribe, and they retained their tribal health care benefits. Tavares was excluded for ten years, while the others were excluded for two years. None of the petitioners had a right to a hearing or an appeal on the exclusion orders.

The Notices also stated that the Council intended to withhold the petitioners' "per capita distributions and all other financial benefits and membership privileges,"

excluding health care benefits, for four years (as to Tavares) and six months (as to the others).  Unlike the exclusion orders, the withholding orders were not effective immediately.  Instead, the petitioners were entitled to a hearing before the Council and to an appeal.  The Council confirmed the proposed suspension of the petitioners' per capita distributions after a hearing.

On appeal, the Appeals Board affirmed the Council's findings and actions in a thirty-page thoroughly-reasoned decision.  It rejected the petitioners' constitutional challenge to the Tribe's anti-defamation ordinance on three grounds: (1) the petitioners' arguments "ignore[d] entirely federal Indian law," (2) the ordinance "d[id] not violate the Tribe's Constitution," and (3) the ordinance satisfied federal constitutional standards.  The Appeals Board affirmed the Council's finding that the petitioners had violated tribal law, concluding that the press releases "sounded a loud (and inaccurate) warning bell to [local businesses and governments] that decisions made by our Tribe and casino may not be reliable, and even illegal, and that our Tribe and casino may not be a stable partner for business or even accepting a donation."  According to the Appeals Board, the petitioners' "sensationalized publicity stunt . . . harms the Tribe, its government infrastructure, its business activities . . . , and the future of tribal members.  It has been our tribal custom and tradition to protect this Tribe and its institutions from the harm caused by this type of defamation outside the tribal forum.  Our ability to be taken seriously as a tribal government and business partner depends on it."

The Appeals Board concluded that the length of the original withholding orders was fair, but acknowledged the unique cultural factors at play: "We, as tribal members, have

distrust of authority bred into us, after centuries of broken promises. We also are concerned about each individual appellant here, who all have families. We are a Tribe composed of a few extended families. Each of us has dependents who we care for. The culture and tradition of this Tribe has been to take care of each other." Thus, "after reflection on and discussion about our tribal customs and traditions and values," the Appeals Board reduced Tavares' per capita withholding by six months (making her ultimate withholding sanction total three-and-a-half years) and the other petitioners' per capita withholding by one month (making their withholding sanctions total five months).[4]

The petitioners filed a petition for a writ of habeas corpus in federal court under 25 U.S.C. § 1303 of the ICRA against the members of the Council.[5] The district court dismissed the petition for lack of subject matter jurisdiction, concluding that the petitioners' punishment was not a "detention" sufficient to invoke federal habeas jurisdiction.

---

[4] As to petitioners Dolly Suehead, Donna Caesar, and Barbara Suehead, the exclusion orders expired on November 15, 2013 and the per capita withholding orders expired on May 1, 2012.

[5] Gene Whitehouse, Brenda Adams, and Calvin Moman were members of both the 2011 and 2013 Councils. John Williams and Danny Rey were members only of the 2013 Council.

**ANALYSIS**

## I.  Principles Animating Habeas Jurisdiction Under § 1303 of the Indian Civil Rights Act

We ground our opinion in two foundational principles in the Indian law canon—tribal sovereignty and congressional primacy in Indian affairs.  We have long recognized that Indian tribes are "distinct, independent political communities, retaining their original natural rights." *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559 (1832).  While tribes lack "the full attributes of sovereignty," they retain the power of self-government. *United States v. Kagama*, 118 U.S. 375, 381–82 (1886).  Tribal sovereignty offers "a backdrop against which the applicable . . . federal statutes must be read." *McClanahan v. State Tax Comm'n of Ariz.*, 411 U.S. 164, 172 (1973).  In other words, to the extent a statute is ambiguous, we construe it liberally in favor of the tribes' inherent authority to self-govern. *See, e.g.*, *Ramah Navajo Sch. Bd., Inc. v. Bureau of Revenue*, 458 U.S. 832, 846 (1982) ("We have consistently admonished that federal statutes and regulations relating to tribes . . . must be 'construed generously in order to comport with . . . traditional notions of [Indian] sovereignty and with the federal policy of encouraging tribal independence.'" (first alteration added) (quoting *White Mountain Apache Tribe v. Bracker*, 448 U.S. 136, 144 (1980))).

A second well-recognized principle is  Congress's "constitutionally prescribed primacy in Indian affairs." Cohen's § 2.01[1], at 110; *see also Washington v. Confederated Bands & Tribes of Yakima Indian Nation*, 439 U.S. 463, 470–71 (1979) (describing Congress's authority over Indian affairs as "plenary and exclusive").  Because

Congress's jurisdiction is plenary, our jurisdiction is correspondingly narrow. *See Lone Wolf v. Hitchcock*, 187 U.S. 553, 565 (1903) ("Plenary authority over the tribal relations of the Indians has been exercised by Congress from the beginning, and the power has always been deemed a political one, not subject to be controlled by the judicial department of the government."). Hence, we refrain from interpreting federal statutes in a way that limits tribal autonomy unless there are "clear indications" that Congress intended to do so. *Santa Clara Pueblo*, 436 U.S. at 60.

Because Indian tribes have sovereignty that predates the Constitution, they are not subject to the constitutional restraints that bind the federal government and the states. *See Talton v. Mayes*, 163 U.S. 376, 382–84 (1896). Congress can, however, impose such restraints by statute as part of its plenary authority over tribal affairs. In 1968, Congress exercised this authority and enacted the ICRA, which extends much of the Bill of Rights to tribes by statute.[6] The ICRA also contains an explicit federal habeas remedy: "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303.

The Supreme Court first analyzed the scope of federal court jurisdiction under the ICRA in *Santa Clara Pueblo*, 436 U.S. 49. The Court held that the ICRA's substantive rights (contained in § 1302 of the statute) did not imply a federal

---

[6] The rights in the ICRA are similar, but not identical, to those contained in the Bill of Rights. For example, the statute has no requirement that tribes provide free counsel for indigent criminal defendants in tribal court. *See United States v. Bryant*, 136 S. Ct. 1954, 1958–59 (2016).

remedy; instead, § 1303 set out the exclusive remedy for violations of the ICRA—a writ of habeas corpus "in a Court of the United States." *Id.* at 69–72. As part of its analysis, the Court noted that one of the primary purposes in enacting the ICRA was to "promote the well-established federal policy of furthering Indian self-government." *Id.* at 62 (citations and internal quotation marks omitted). Although the Court recognized that Congress also intended to "strengthen[] the position of individual tribal members vis-à-vis the tribe," it concluded that finding an implied cause of action would strengthen this goal only at the expense of tribal sovereignty. *Id.* In sum, federal remedies beyond habeas were "not plainly required to give effect to Congress' objective[s]." *Id.* at 65. With these principles in mind, we address whether the district court had habeas jurisdiction over the per capita withholding or the temporary exclusion orders.

## II. Per Capita Withholding Orders

As a threshold matter, we quickly dispose of the argument that the petitioners' per capita withholding orders created habeas jurisdiction under the ICRA.[7]

In *Shenandoah v. U.S. Department of the Interior*, the Second Circuit explained that the loss of quarterly distributions paid to all tribal members is "insufficient to bring plaintiffs within ICRA's habeas provision," 159 F.3d 708, 714 (2d Cir. 1998), a determination that we cited with approval in *Jeffredo v. Macarro*. 599 F.3d 913, 919 (9th Cir. 2009). This conclusion falls squarely within the "general

---

[7] Although it is not entirely clear in their briefs, the petitioners appear to argue that withholding of distributions creates habeas jurisdiction in whole or part. To the extent they raise this argument, we address it here.

rule" that "federal habeas jurisdiction does not operate to remedy economic restraints." *Shenandoah v. Halbritter*, 366 F.3d 89, 92 (2d Cir. 2004); *see also United States v. Thiele*, 314 F.3d 399, 402 (9th Cir. 2002) (writing that cognizable claims "do not run interference for non-cognizable claims"). Any disputes about per capita payments must be brought in a tribal forum, not through federal habeas proceedings. *See* 25 C.F.R. §290.23; *Lewis v. Norton*, 424 F.3d 959, 963 (9th Cir. 2005).

## III.    Temporary Exclusion Orders

We now turn to the crux of this appeal—whether the petitioners, who were temporarily excluded from tribal lands, were in "detention" under § 1303 for purposes of federal habeas jurisdiction.[8]

We start with the words Congress used in § 1303, focusing on a difference between the language used in that provision and the language used in the general federal habeas statutes. When Congress enacted the ICRA in 1968, it was legislating against a well-established habeas framework: the federal courts have habeas jurisdiction whenever a petitioner

---

[8] The two-year exclusion orders applicable to Dolly and Barbara Suehead and Donna Caesar expired before briefing in this appeal was completed and hence there is no longer a live controversy. *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013). Even assuming habeas jurisdiction were proper, petitioners' suggestion that the expired orders had continuing consequences in a habeas sense is totally speculative. Thus, we dismiss their appeals on mootness grounds, and also affirm the district court's dismissal of their claims on jurisdictional grounds.

is "in custody." *See* 28 U.S.C. §§ 2241, 2255;**[9]** *see also Jones v. Cunningham*, 371 U.S. 236, 236 (1963) (quoting 28 U.S.C. § 2241); Judiciary Act of Sept. 24, 1789, § 14, 1 Stat. 73, 82. Yet Congress chose not to incorporate this language into the ICRA. Instead, under § 1303, habeas corpus is available only to a person who wishes to "test the legality of his detention by order of an Indian tribe." In addition to the usual rule that different words in a statute ordinarily convey different meanings, *S.E.C. v. McCarthy*, 322 F.3d 650, 656 (9th Cir. 2003), we think Congress's use of "detention" instead of "custody" when it created habeas jurisdiction over tribal actions is significant in multiple respects.

At the time Congress enacted the ICRA, "detention" was generally understood to have a meaning distinct from and, indeed, narrower than "custody." Specifically, "detention" was commonly defined to require physical confinement. *See,*

---

**[9]** The requirement that a petitioner be "in custody" is stated in every section of the statutory provisions for state and federal habeas jurisdiction. *See* 28 U.S.C. §§ 2241(c)(1)–(4) ("The writ of habeas corpus shall not extend to a prisoner unless — (1) He is *in custody* under or by color of the authority of the United States or is committed for trial before some court thereof; or (2) He is *in custody* for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States; or (3) He is *in custody* in violation of the Constitution or laws or treaties of the United States; or (4) He, being a citizen of a foreign state and domiciled therein is *in custody* for an act done or omitted under any alleged right, title, authority, privilege, protection, or exemption claimed under the commission, order or sanction of any foreign state, or under color thereof . . . ." (emphases added)), 2254(a) (rendering habeas relief available to "a person in custody pursuant to the judgment of a State court"), 2255(a) (rendering motions to "vacate, set aside or correct the sentence" available to "[a] prisoner in custody under sentence of a court established by Act of Congress").

*e.g.*, *Preiser v. Rodriguez*, 411 U.S. 475, 484–85 (1973) (equating "detention" and "physical confinement"); *see also* Ballentine's Law Dictionary 343 (3d ed. 1969) (defining "detention" as "[h]olding one arrested on a charge of crime"). By contrast, "custody" had a more fluid definition: while it meant "physical control of the person," it did not require physical confinement or imprisonment. *Id.* at 300. Instead, a person was in custody for habeas purposes if there was "restraint of [that] person by another [such] that the latter can produce the body of the former at a hearing as directed by writ or order." *Id.* In other words, at the time of the ICRA's enactment, detention was understood as a subset of custody. *See also* Black's Law Dictionary 460 (4th ed. 1968) (defining "custody" as encompassing "[d]etention; charge; control; possession" and noting that "[t]he term is very elastic and may mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession").

It is also notable that Congress used "detention" at the same time that the Supreme Court had begun to expand the scope of "custody" in the federal habeas statutes. Courts "normally assume that, when Congress enacts statutes, it is aware of relevant judicial precedent." *Merck & Co. v. Reynolds*, 559 U.S. 633, 648 (2010). The history and precedent here are informative.

Under English common law, and for much of our history, physical custody, confinement, or detention was required as a prerequisite to habeas relief. *See, e.g.*, *Rumsfeld v. Padilla*, 542 U.S. 426, 437 (2004) (recognizing that "we no longer require physical detention as a prerequisite to habeas relief"); *Preiser*, 411 U.S. at 486 (collecting cases in which the petitioner complained of "being unlawfully subjected to

physical restraint"); *Wales v. Whitney*, 114 U.S. 564, 569 (1885) (finding no habeas jurisdiction where "petitioner [wa]s under no physical restraint"); 3 William Blackstone, Commentaries *129–37. Beginning in 1963, however, the Supreme Court expansively interpreted "custody" to include continued oversight by criminal justice authorities with the prospect of revocation of parole and return to incarceration. *See Jones*, 371 U.S. at 243 (holding that parolee was in custody, in part because he remained subject to the custody and control of the state parole board); *see also Hensley v. Mun. Court*, 411 U.S. 345, 351 (1973) (formulating the "severe restraint[] on individual liberty" test for custody, and holding that petitioner was in custody when he was released on personal recognizance pending execution of his sentence).[10]

By the time Congress enacted the ICRA in 1968, this expansion of "custody" was well under way. The Supreme Court had already explained that "custody" should not be construed unduly narrowly because habeas "is not now and never has been a static, narrow, formalistic remedy; its scope has grown to achieve its grand purpose—the protection of individuals against erosion of their right to be free from wrongful restraints upon their liberty." *Jones*, 371 U.S. at 243. Congress could have used the parallel "in custody" language or indicated that ICRA's habeas provision was to be

---

[10] Neither *Jones* nor *Hensley* mention, much less discuss, "detention." *See generally Hensley*, 411 U.S. 345; *Jones*, 371 U.S. 236.

read in light of that jurisprudence by using "custody" rather than "detention," but it did not do so.[11]

Our conclusion that we should credit Congress's use of "detention" to narrow the scope of federal habeas jurisdiction over ICRA claims is bolstered by the limited legislative history. During deliberations in the House of Representatives, House Minority Leader Gerald Ford submitted a memorandum from the House Committee on the Judiciary that equated detention in the ICRA context with imprisonment: under § 1303, the "habeas corpus application for release from tribal detention shall be made in the Federal courts (under present Constitutional practice, non-Indian citizens, if imprisoned under state law, must first seek habeas

---

[11] The only other court that has analyzed whether "detention" and "custody" should be interpreted differently determined only that "detention" should not be construed more *broadly* than "custody." *See Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 890–93 (2d Cir. 1996); *see also Jeffredo*, 599 F.3d at 918 (citing the adoption of *Poodry*'s analysis by *Moore v. Nelson*, 270 F.3d 789, 791 (9th Cir. 2001)). The Second Circuit examined the federal habeas statutes, 28 U.S.C. § 2241 *et seq.*, and concluded that they "appear[] to use the terms 'detention' and 'custody' interchangeably." *Poodry*, 85 F.3d at 890–91. However, while some provisions of the federal habeas statutes appear to use the terms synonymously, others treat "detention" as a subset of "custody." *Compare, e.g.*, 28 U.S.C. § 2245 (last amended June 25, 1948) ("On the hearing of an application for a writ of habeas corpus to inquire into the legality of the detention of a person pursuant to a judgment the certificate of the judge who presided at the trial resulting in the judgment . . . shall be admissible in evidence."), *with id.* § 2242 (last amended June 25, 1948) (stating that an "[a]pplication for a writ of habeas corpus . . . shall allege the facts concerning the applicant's *commitment or detention*" (emphasis added)). Even if these provisions create ambiguity as to the meaning of the ICRA's use of "detention," such ambiguities must be resolved in favor of the tribes' inherent authority to self-govern. *Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 846; Cohen's § 2.02[1], at 113.

corpus by exhausting available state court remedies before applying to Federal courts.).”  114 Cong. Rec. 9611 (1968). Representative Reifel similarly explained that habeas corpus under the ICRA “would assure effective enforcement of . . . fundamental [trial] rights” that arise in the criminal context, including the prohibition on double jeopardy, the privilege against self-incrimination, and the right to confront witnesses. *Id.* at 9553.  As the Supreme Court in *Santa Clara Pueblo* recognized, Congress’s “legislative investigation revealed that the most serious abuses of tribal power had occurred in the administration of criminal justice.  In light of this finding, . . . Congress chose at this stage to provide for federal review only in habeas corpus proceedings.”  436 U.S. at 71 (internal citation omitted); *see also id.* at 67 (describing “habeas corpus as the exclusive means for federal-court review of tribal criminal proceedings”); William C. Canby, Jr., American Indian Law in a Nutshell 422 (6th ed. 2014) (concluding that, post–*Santa Clara Pueblo*, “the effectuation of the non-criminal portions of the Indian Civil Rights Act lies exclusively with [the tribal courts]”).[12]

---

[12] We need not decide whether § 1303 applies only in the criminal context.  We merely note that Congress was concerned with a narrower subset of tribal activity than would be covered under the current-day “custody” standard.  On this point, the dissent argues that “detention” and “custody” should be understood as synonymous because the language of § 1303 tracks that of *Colliflower v. Garland*, 342 F.2d 369 (9th Cir. 1965), a pre-ICRA case extending general habeas jurisdiction over a tribe’s incarceration of a tribal member that was cited with approval during 1965 Senate subcommittee hearings on the ICRA.  Dissent 35.  But *Colliflower* extended general habeas jurisdiction for a reason not applicable here: because the tribe’s courts, having been developed under the supervision and the guidelines of the Department of the Interior’s Bureau of Indian Affairs, functioned “in part as a federal agency and in part as a tribal agency.”  *Id.* at 379.  Importantly, *Colliflower* did not have occasion to consider the scope of “detention” because the court used the term to refer

Three cases that involve the limits of detention under § 1303 inform our analysis. We begin with *Poodry*, the first case to address this issue. 85 F.3d 874. The petitioners, members of the Tonawanda Band, were convicted of treason after they accused the tribal council of misconduct. *Id.* at 877–78. As punishment, the tribe disenrolled them and permanently banished them from the whole of the tribe's 7,500 acre reservation. *Id.* at 878. The disenrollment and banishment orders were served on the petitioners at their homes by up to twenty-five people, who attempted to take the petitioners "into custody and eject them from the reservation." *Id.* Although the initial ejection attempts failed, the respondents "continued to harass and assault the petitioners and their family members," attacking one petitioner on Main Street and "stoning" a second petitioner. *Id.* The tribe also denied the petitioners home electrical services and health services and medications. *Id.*

The Second Circuit held that the ICRA created federal habeas jurisdiction over the tribal actions. Construing ICRA's "detention" requirement as "no broader" than the "custody" requirement of other federal habeas statutes, the Second Circuit concluded that the facts alleged—including the manner in which the banishment orders were served, the attempts at removal, the threats and assaults, and the denial of electrical services—constituted "severe restraints on [individual] liberty" under *Hensley*'s custody test. *Id.* at 893–95.

---

to a situation within the traditional confines of habeas corpus jurisdiction: Colliflower's incarceration pursuant to a criminal conviction. *See id.* at 371.

The Second Circuit did not clearly distinguish between whether it was the disenrollment or banishment of the petitioners that constituted the severe restraint on liberty, although it focused on the disenrollment. *See id.* at 895 ("Indeed, we think the existence of the orders of permanent banishment alone . . . would be sufficient to satisfy the jurisdictional prerequisites for habeas corpus. We deal here . . . with the *coerced and peremptory deprivation of the petitioners' membership in the tribe and their social and cultural affiliation*." (emphasis added)); *see also id.* at 897 (characterizing the question at issue as "whether a federal court has jurisdiction to examine the scope of and limitations on the Tonawanda Band's power to strip the petitioners of their tribal membership"); *id.* at 901 (rejecting argument that "membership determinations [are] committed to the absolute discretion of the tribe").

Two years later, in *Shenandoah*, the Second Circuit revisited jurisdiction under the ICRA. 159 F.3d 708. The petitioners in *Shenandoah*, like the petitioners in *Poodry*, were members of a tribe who challenged tribal leadership. The petitioners alleged that, because of these activities, they lost their jobs, their "voice[s]" in tribal governance, their health insurance, their access to the tribe's health center, and their quarterly per capita distributions; were banished from tribal businesses and recreational facilities; were stricken from tribal membership rolls; were prohibited from speaking with some tribe members; and were not sent tribal mailings. *Id.* at 714.

Significantly, the Second Circuit stepped back from *Poodry* and limited its reach. It clarified that *Poodry* had only recognized federal habeas jurisdiction for cases involving permanent banishment. *Id.* at 714 (citing *Poodry*

in support of the proposition that "[h]abeas relief does address more than actual physical custody, and includes parole, probation, release on one's own recognizance pending sentencing or trial, and permanent banishment"). The Second Circuit then concluded that the tribe's misconduct at issue in *Shenandoah*, while "serious," was not a sufficiently severe restraint on liberty to create habeas jurisdiction. *Id.*

Notably, the Second Circuit again conflated disenrollment and banishment in its analysis. The court characterized the punishment in *Poodry* as considerably more severe than the punishment in *Shenandoah* because in *Poodry*, "the petitioners were convicted [ ] of treason, sentenced to permanent banishment, and stripped of . . . Indian citizenship; their names were removed from the Tribal rolls; and they permanently [lost] any and all rights afforded [tribal] members." *Id.* (internal quotation marks omitted). By contrast, the petitioners in *Shenandoah* "[did] not allege[] that they were banished from the Nation, deprived of tribal membership, convicted of any crime, or that defendants attempted in anyway [sic] to remove them from [tribal land]." *Id.*

In 2010, our court addressed the scope of habeas jurisdiction under § 1303 of the ICRA in *Jeffredo*. 599 F.3d 913. The Pechanga Band of the Luiseño Mission Indians disenrolled a number of its members following a dispute about their lineage. *Id.* at 915. As a result of their disenrollment, the petitioners lost access to the tribe's senior citizen center, health clinic, and schools. *Id.* at 918–19. Although they were not excluded from the reservation, the petitioners contended that, because of their new status as non-members, they were "under a continuing threat of banishment/exclusion." *Id.* at 919. They filed a habeas

petition under the ICRA, arguing that their disenrollment "was tantamount to an unlawful detention." *Id.* at 915.

We held that the district court lacked jurisdiction because the petitioners were not detained under § 1303. *Id.* We engaged in a factual inquiry about the severity of the restrictions the petitioners faced, noting that the petitioners "have not been banished from the Reservation," "have never been arrested, imprisoned, fined, or otherwise held by the Tribe," "have not been evicted from their homes or suffered destruction of their property," have not had "personal restraint (other than access to [certain] facilities)" imposed on them, and have not had their movements on the Reservation subject to restriction. *Id.* at 919.

Unlike the Second Circuit, we distinguished between disenrollment and banishment, and recognized that there is no federal habeas jurisdiction over tribal membership disputes. *Id.* at 920 (citing *Santa Clara Pueblo*, 436 U.S. at 72 n.32) (observing that "[w]e cannot circumvent our lack of jurisdiction over [tribal decisions regarding disenrollment of members] by expanding the scope of the writ of habeas corpus to cover exactly the same subject matter").[13]

---

[13] The dissent's claim that *Jeffredo* is "binding precedent" that dictates the result is not borne out by an examination of the analysis. Dissent 38. Notably, *Jeffredo* relied on *Moore* as the sole authority supporting the proposition that detention "must be interpreted similarly" to custody, 599 F.3d at 918, and as *Jeffredo* itself acknowledges, *Moore* stated merely that "[t]here is no reason to conclude that the requirement of 'detention' set forth in . . . § 1303 is *any more lenient* than the requirement of 'custody' set forth in the other habeas statutes," 270 F.3d at 791 (emphasis added). In stating that "an ICRA habeas petition is only proper when the petitioner is in custody," *Jeffredo* correctly recognized that being "in custody" is a necessary condition for jurisdiction under the

Looking at the statute and these cases, several principles emerge. First, we do not need to decide whether to adopt *Poodry*'s conclusion that tribal banishment orders amount to "detention" under § 1303, because even under *Poodry*'s logic, the Second Circuit limited habeas jurisdiction only to permanent banishment orders, not temporary exclusion orders like those in this case. *Poodry*, 85 F.3d at 901; *see also Shenandoah*, 159 F.3d at 714. In addition, we have already rejected *Poodry*'s assertion of federal habeas jurisdiction over tribal membership disputes. *Compare Poodry*, 85 F.3d at 901 (rejecting argument that "membership determinations [are] committed to the absolute discretion of the tribe"), *with Jeffredo*, 599 F.3d at 920 ("We find . . . nothing in the legislative history of § 1303 that suggests the [habeas] provision should be interpreted to cover disenrollment proceedings."). We also have taken issue with *Poodry*'s assertion that a tribe's interference with "an individual's social, cultural, and political affiliations" can create custody. *Compare Poodry*, 85 F.3d at 897, *with Jeffredo*, 599 F.3d at 921.[14]

---

ICRA. 599 F.3d at 918. However, because the panel subsequently determined that the petitioners were not in custody, it did not have occasion to determine (as we do here) whether custody is a *sufficient* condition to create habeas jurisdiction under the ICRA.

[14] The dissent places great weight on *Poodry*, describing the case as the "leading authority" on banishment orders. *See* Dissent 44 n.9. Not only is *Poodry* inapposite for the reasons we have already outlined, but also, *Poodry* has been extensively criticized for disrupting the balance Congress struck in the ICRA between preserving tribal sovereignty and upholding the rights of individual tribe members. *See, e.g.*, Cohen's § 14.04[2], at 986–87 (observing that *Poodry*'s "attempt[] to circumvent exclusive tribal jurisdiction disrupt[s] the delicate balance of tribal and federal interests established by Congress" and risks "insert[ing] the federal courts into precisely the types of internal tribal decisions that most

Second, the federal courts lack jurisdiction to review direct appeals of tribal membership decisions because they fall within the scope of tribes' inherent sovereignty. *Jeffredo*, 599 F.3d at 915. In many cases, a tribe's decision to temporarily exclude a member will be another expression of its sovereign authority to determine the makeup of the community.[15] *See* Kunesh, *supra* note 1, at 86. Because exclusion orders are often intimately tied to community relations and membership decisions, we cannot import an exclusion-as-custody analysis from the ordinary habeas context. *See Santa Clara Pueblo*, 436 U.S. at 72 n.32 ("A tribe's right to define its own membership for tribal purposes has long been recognized as central to its existence as an independent political community. Given the often vast gulf between tribal traditions and those with which federal courts are more intimately familiar, the judiciary should not rush to create causes of action that would intrude on these delicate matters." (citations omitted)).[16]

---

implicate tribal sovereignty"); Kunesh, *supra* note 1, at 124 (criticizing *Poodry* for "unabashedly substitut[ing] its own legal and cultural bias for the U.S. legal system and the rights and protections established under federal law").

[15] The use of exclusion as a tool of social control is by no means unique to the tribes. *See* Nan Goodman, *Banished: Common Law and the Rhetoric of Social Exclusion in Early New England* 1–2 (2012) (noting that "inclusion and exclusion are paired" because they both help define the community).

[16] The dissent asserts that "[b]anishment has generally been held to satisfy the 'in custody' requirement of the general habeas laws." Dissent 42 (alteration in original) (quoting Cohen's § 9.09, at 780–81) (internal quotation marks omitted). But the only authority the dissent cites for this proposition is Cohen's Handbook of Federal Indian Law, which in fact states only that "banishment has been generally held to satisfy the 'in

Third, tribes have the authority to exclude non-members from tribal land. *See Merrion v. Jicarilla Apache Tribe*, 455 U.S. 130, 142 (1982) (recognizing tribes' authority to exclude non-members); *Hardin v. White Mountain Apache Tribe*, 779 F.2d 476, 479 (9th Cir. 1985) (same). If tribal exclusion orders were sufficient to invoke habeas jurisdiction for tribal members, there would be a significant risk of undercutting the tribes' power because "any person," members and non-members alike, would be able to challenge exclusion orders through § 1303. Thus, tribal sovereignty vis-à-vis exclusion of non-members would collide with habeas jurisdiction.

With this framework in mind, we return to the principles animating habeas jurisdiction under § 1303 of the ICRA. We view Congress's choice of "detention" rather than "custody" in § 1303 as a meaningful restriction on the scope of habeas jurisdiction under the ICRA. *See Merck & Co.*, 559 U.S. at 648. But to the extent that the statute is ambiguous, we construe it in favor of tribal sovereignty. *Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 846; Cohen's § 2.02[1], at 113. A temporary exclusion is not tantamount to a detention. And recognizing the temporary exclusion orders at issue here as beyond the scope of "detention" under the ICRA bolsters tribes' sovereign authority to determine the makeup of their communities and best preserves the rule that federal courts should not entangle themselves in such disputes.

Petitioners' contrary reading of the statute cannot be reconciled. They make much of the fact that their cases do not involve disenrollment and argue that we should

custody' requirement" *read into* the ICRA by *Poodry* and two district court cases. *See* Cohen's § 9.09, at 780–81 & n.16. Again, this broad statement circles back to *Poodry*'s flawed analysis.

distinguish *Jeffredo* on this basis. We agree that it is significant that the petitioners have only been temporarily excluded, but we disagree with the conclusion they draw. If we adopted the petitioners' proposed rule that exclusion of any duration creates habeas jurisdiction, it would create a perverse incentive for tribes to first disenroll and *then* banish a member. Because federal courts lack jurisdiction over membership decisions, and because tribes have authority to exclude non-members from tribal lands, this two-step dance could be a loophole to avoid federal jurisdiction under the ICRA. By incentivizing disenrollment, the petitioners' proposed construct runs counter to Congress's goal of "strengthening the position of individual tribal members vis-à-vis the tribe" by enacting the ICRA. *Santa Clara Pueblo*, 436 U.S. at 62.

Nor is the dissent's interpretation of § 1303 persuasive. As we have explained, statutory interpretation and the legislative history support reading detention more narrowly than custody, but to the extent that the statute is ambiguous, we construe the statute in favor of Indian sovereignty in accord with the Indian canons of construction. *See Ramah Navajo Sch. Bd., Inc.*, 458 U.S. at 846; Cohen's § 2.02[1], at 113. These canons seemingly play no role in the dissent's analysis. Instead, the dissent claims that to preserve the balance Congress struck "between the protection of tribal sovereignty and the vindication of civil rights," "we ought simply to apply the standard of federal habeas law." Dissent 49.

The dissent fails to recognize that it is precisely the indiscriminate importation of an external body of law into the ICRA that risks trenching upon that balance. Under its reading, even if a tribe member was disenrolled from the

tribe, the tribe's decision to exclude that former member would still be subject to judicial review, even while a decision to exclude a non-member would not be. *See* Dissent 49–50. The dissent argues that former tribe members should enjoy a special status because "[t]ribes' power to ban non-members from their land is rooted in their inherent power as separate sovereigns," while "tribes' power to ban tribal members from their land was explicitly 'limit[ed]' and 'modif[ied]' by Congress's use of its 'plenary authority' to provide individual rights to American Indians and to establish a narrow mechanism of review to protect those rights." Dissent 50 (second and third alterations in original). This reading of the ICRA cannot be reconciled with the statute itself: the ICRA does not "explicitly" address exclusion orders, and many of its provisions, including § 1303, apply to tribe members and non-members alike. *See also* 25 U.S.C. § 1302. Nor does the dissent explain why it would be an intrusion on tribal sovereignty to prevent a tribe from excluding non-members, but not an intrusion to prevent a tribe from excluding former or current tribe members. On the contrary: as we have observed, the ability to determine the membership of the community has long been regarded as an essential attribute of sovereignty.

Thus, we conclude that the district court lacked jurisdiction under § 1303 of the ICRA to review the challenge to the temporary exclusion orders. In so holding, we in no way minimize the significance of petitioners' allegations or the personal impact of the exclusion orders. The petitioners raise free speech and due process claims that implicate the substantive protections Congress saw fit to grant Indians with respect to their tribes through the ICRA. *See Quair v. Sisco*, 359 F. Supp. 2d 948, 962 (E.D. Cal. 2004) ("Section 1302 [of the ICRA] provides that no Indian tribe in exercising powers

of self-government shall do or fail to do the things set forth in Section 1302."). But the petitioners' remedy is with the Tribe, not in the federal courts. *Cf. Fisher v. Dist. Court*, 424 U.S. 382, 390–91 (1976) ("[E]ven if a jurisdictional holding occasionally results in denying an Indian plaintiff a forum to which a non-Indian has access, such disparate treatment of the Indian is justified because it is intended to benefit the class of which he is a member by furthering the congressional policy of Indian self-government.").

**APPEAL DISMISSED AS MOOT WITH RESPECT TO DOLLY AND BARBARA SUEHEAD AND DONNA CAESAR AND AFFIRMED FOR LACK OF JURISDICTION WITH RESPECT TO ALL PETITIONERS.**

WARDLAW, Circuit Judge, concurring in part and dissenting in part:

I agree with the majority that we lack habeas jurisdiction over the UAIC's withholding orders, and that the expired two-year banishment orders against Dolly and Barbara Suehead and Dona Caesar should be dismissed as moot. However, I conclude that Jessica Tavares's ten-year banishment order severely restrains her liberty and constitutes "detention" under the Indian Civil Rights Act ("ICRA"). Therefore, I respectfully disagree with the majority's holding that we lack jurisdiction to entertain her habeas petition.

Tavares is a longtime leader of the UAIC. She served on the Tribal Council from approximately 1998 to 2010; for many of these years, she was Council Chair. In 2011,

Tavares helped to organize a campaign to remove certain Tribal Council members from office for malfeasance, alleging financial misdealings and corruption related to tribal elections. Notwithstanding Tavares's right to free expression,[1] the tribe accused her of making "misrepresentations against the Tribe" and "defaming [its] reputation" in violation of tribal law.

In retaliation, the tribe informed Tavares that she was henceforth "banned from tribal lands and facilities, for a period of ten (10) years, due to [her] repeated and serious violations of tribal law, effective November 15, 2011."[2] The tribe's order further specified that Tavares was "banned from attending any tribally sponsored events and/or entering all Tribal properties and/or surrounding facilities, which includes, but is not limited to the Tribal Offices, Thunder Valley Casino, the UAIC School, Health and Wellness facilities at the Rancheria, and/or the Park at the Rancheria." The restraint on Tavares's individual liberty is obvious: she cannot set foot on her tribe's reservation.

The district court was correct to recognize that "the restraint in this case was severe." *Tavares v. Whitehouse*,

---

[1]  The ICRA's free expression clause reads in relevant part, "No Indian tribe in exercising powers of self-government shall . . . (1) make or enforce any law . . . abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble and to petition for a redress of grievances . . . ."  25 U.S.C. § 1302(a).

[2]  The majority opinion avoids referring to the Petitioners' "banishment," using instead the euphemism "exclusion." Maj. Op. 8. My use of the terms "banned" and "banishment" reflects the language the UAIC Tribal Council used to describe the punishment it meted out to Petitioners.  The UAIC does not dispute that Petitioners were "banned."

No. 2:13–CV–02101–TLN, 2014 WL 1155798, at *10 (E.D. Cal. Mar. 21, 2014). Having so found, it should have exercised jurisdiction over her habeas petition pursuant to 25 U.S.C. § 1303.[3]

## I.

### A.

"As separate sovereigns pre-existing the Constitution, tribes have historically been regarded as unconstrained by those constitutional provisions framed specifically as limitations on federal or state authority." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978). However, "Congress has plenary authority to limit, modify or eliminate the powers of local self-government which the tribes otherwise possess." *Id.* "Title I of the ICRA, 25 U.S.C. §§ 1301–1303, represents an exercise of that authority." *Id.* at 57.

Congress enacted the ICRA in 1968 "to insure that the American Indian is afforded the broad constitutional rights secured to other Americans." S. Rep. No. 90-841, at 6 (1967). A "central purpose of the ICRA" was to "'protect individual Indians from arbitrary and unjust actions of tribal governments.'" *Santa Clara Pueblo*, 436 U.S. at 61 (quoting S. Rep. No. 90-841, at 5–6). Accordingly, the ICRA "impos[es] certain restrictions upon tribal governments similar, but not identical, to those contained in the Bill of Rights and the Fourteenth Amendment." *Id.* at 57; *see also* 25 U.S.C. § 1302. The rights enumerated in § 1302 do not

---

[3] Section 1303 states, in full, "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian tribe."

contain implied causes of action. *Santa Clara Pueblo*, 436 U.S. at 51–52, 72. But Congress provided an explicit cause of action to protect the rights that it chose to grant to the American Indian: the "privilege of the writ of habeas corpus." 25 U.S.C. § 1303.

Though narrow, this claim for relief is firmly established. *See Boe v. Fort Belknap Indian Cmty.*, 642 F.2d 276, 278–79 (9th Cir. 1981) (describing 25 U.S.C. § 1303 as "[t]he only avenue available to a party who seeks relief in the federal courts for an alleged violation of the ICRA"). Of course, recognizing the "well-established federal policy of furthering Indian self-government," *Santa Clara Pueblo*, 436 U.S. at 62 (internal quotation marks omitted), we "should not rush to create causes of action" that would intrude upon tribes' inherent sovereignty, *id.* at 72 n.32. But we are not asked to "create causes of action" in this case; we are asked to apply the only law by which Indians may vindicate their ICRA rights—the congressionally granted right to petition for habeas relief.

Tavares presents us with precisely the kind of case over which Congress intended to establish federal jurisdiction: having exercised her right to free expression which Congress, through the ICRA, had explicitly guaranteed her, Tavares suffered retaliation from the UAIC in the form of "severe restraints on individual liberty" not shared by other members of her tribe. *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 894 (2d Cir. 1996) (internal quotation marks omitted). "[R]estraints on a [person's] liberty . . . not shared by the public generally . . . have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." *Jones v. Cunningham*, 371 U.S. 236, 240 (1963). This is the trigger for jurisdiction that Congress designed.

We should acknowledge our congressionally mandated jurisdiction and exercise our duty to adjudicate Tavares's petition, as Congress intended when it balanced Indian sovereignty against individual rights in the ICRA. It is not our place to recalibrate that balance.

## B.

"The term 'detention' in the [ICRA] statute must be interpreted similarly to the 'in custody' requirement in other habeas contexts." *Jeffredo v. Macarro*, 599 F.3d 913, 918 (9th Cir. 2009). Reflecting this principle, the bodies of law construing the "detention" and "custody" requirements are interdependent. Just as habeas courts applying the ICRA rely on authorities construing "custody" in general habeas contexts, courts in general habeas contexts rely on authorities construing "detention" under the ICRA. For instance, the Third Circuit concluded in a non-ICRA case that a person sentenced to perform five hundred hours of community service was "in custody," relying in part on the Second Circuit's analysis of "detention" in an ICRA case. *Barry v. Bergen Cty. Prob. Dep't*, 128 F.3d 152, 161 (3d Cir. 1997) (discussing *Poodry*, 85 F.3d at 894–95).

The majority holds that "detention" as used in the ICRA is "understood as a subset of custody." Maj. Op. 16. The majority suggests that the absence of the word "custody" from 25 U.S.C. § 1303 is significant because, by contrast, the word "custody" is used in "every section" of federal habeas statutes 28 U.S.C. §§ 2241(c)(1)–(4), 2254(a), and 2255(a). However, the word "detention" *also* appears frequently throughout other sections of the federal habeas statutes. *See* 28 U.S.C. §§ 2245, 2249, 2253 (referring to "detention" only); §§ 2241, 2242, 2243, 2244, 2255 (referring to both

"detention" *and* "custody," apparently interchangeably); *cf.* §§ 2252, 2254 (referring to "custody" only). There is no indication in any part of any section that the terms might have distinct meanings: if anything, the statutes suggest, as a whole, that "detention" and "custody" are interchangeable. This is why the *Poodry* court declined to differentiate between "detention" and "custody," stating,

> We find the choice of language unremarkable in light of references to "detention" in the federal statute authorizing a motion attacking a federal sentence, *see* § 2255, as well as in the procedural provisions accompanying § 2241, *see* §§ 2242, 2243, 2244(a), 2245, 2249, 2253. Congress appears to use the terms "detention" and "custody" interchangeably in the habeas context. We are therefore reluctant to attach great weight to Congress's use of the word "detention" in § 1303.

85 F.3d at 890–91.

Reliance upon legislative history is unnecessary to supplement our statutory analysis. *See Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 830–31 (9th Cir. 1996), *as amended on denial of reh'g* (May 30, 1996) ("In interpreting a statute, we look first to the plain language of the statute, construing the provisions of the entire law, including its object and policy, to ascertain the intent of Congress. Then, if the language of the statute is unclear, we look to its legislative history." (internal quotation marks omitted)). But to the extent that legislative history is relevant, it supports our exercise of jurisdiction to entertain Tavares's habeas petition.

The limited legislative history available suggests that "detention" and "custody" are interchangeable terms in the habeas context.  The language of § 1303 "closely tracks the language of *Colliflower v. Garland*, 342 F.2d 369 (9th Cir. 1965)[, *overruled on other grounds by United States v. Wheeler*, 435 U.S. 313 (1978), *as recognized by Davis v. Muellar*, 643 F.2d 521, 532 n.13 (8th Cir. 1981)]." *Poodry*, 85 F.3d at 891.  In *Colliflower*, we relied on the broad scope of the general federal habeas statutes to conclude that "it is competent for a federal court in a habeas corpus proceeding to inquire into the legality of the detention of an Indian pursuant to an order of an Indian court."  342 F.2d at 379. Observing that Congress "frequently invoked [*Colliflower*] with approval during the 1965 [Subcommittee on Constitutional Rights of the Senate Judiciary Committee] hearings" that preceded the ICRA's enactment, the Second Circuit concluded that Congress intended the ICRA's habeas provision to be as broad as, but "no broader than," its federal counterparts.[4]  *Poodry*, 85 F.3d at 891, 893.

---

[4]  The majority opinion contends that we ought to disregard this piece of legislative history in part because *Colliflower* involved a prisoner incarcerated due to a criminal conviction, and so did not consider the scope of "detention" beyond "the traditional confines of habeas corpus jurisdiction."  Maj. Op. 19–20 n.12.  Of course, an identical point can be made about *Preiser v. Rodriguez*, 411 U.S. 475, 484–85 (1973), on which the majority relies to support its argument that "physical confinement" is a requirement of "detention," Maj. Op. 15–16, but there the majority seems unconcerned with this distinction.

My point is not that *Colliflower* is authoritative precedent for the exact issue before us.  If it were, such a lengthy decision would be unnecessary.  But given that there is, as the majority opinion notes, little other legislative history for us to consider, Maj. Op. 18, *Colliflower* is relevant because it apparently guided Congress's understanding that the habeas provision it was enacting within ICRA would be as broad as the

The majority opinion highlights two pieces of history from the ICRA's enactment to support its contrary position, but neither is persuasive.  First, the majority contends that a memorandum prepared by the House of Representatives Committee on the Judiciary supports its conclusion because the memorandum describes the function of § 1303 with a single reference to "tribal detention," not "custody."  114 Cong. Rec. 9611 (1968).  But the memorandum is not an analytical discussion of Congress's word choice of "detention" in the statute.  It is merely a brief summary of § 1303; indeed it is unsurprising that the memorandum mirrors the statutory language.  The *entirety* of the excerpt dedicated to the whole of the ICRA's provision of individual rights—of which § 1303 was but one part—is barely 150 words long. *See id.*  Like the Second Circuit, I am "therefore reluctant to attach great weight to Congress's use of the word 'detention' in § 1303." *Poodry*, 85 F.3d at 891.

Second, the majority speculates that Representative Reifel's remarks on the floor of the House show that the ICRA's habeas provision was intentionally circumscribed to rights associated with criminal trials.  Representative Reifel noted that the provision of a federal habeas forum in § 1303 would "assure effective enforcement of [the] fundamental rights" enumerated in the ICRA.  114 Cong. Rec. 9553 (1968).  Those include not only protections associated with criminal trials, *see* 25 U.S.C. § 1302(a)(3)–(10), but also the ICRA's analogues to the First and Fourth Amendments, *see* § 1302(a)(1)–(2).  Thus, Representative Reifel's commentary does not support the majority's argument that § 1303 is limited only to rights associated with criminal trials.  In any

federal habeas statutes that had long been part of the nation's laws.  The majority opinion does not respond to this point.

case, Representative Reifel's brief remarks do not illuminate any purported nuances distinguishing "detention" from "custody"; his comments are irrelevant to our analysis of the language Congress chose when it enacted § 1303.

## C.

To reach its holding that "detention" in the ICRA is narrower than "custody" in the general habeas statutes, the majority relies heavily upon *Poodry*'s phrasing that 25 U.S.C. § 1303 "is *no broader* than analogous statutory provisions for collateral relief." 85 F.3d at 893 (emphasis added). But *Poodry* used the phrase "no broader" specifically because two courts—including ours—had previously held that "detention" in the ICRA was *broader* than "custody" in the non-ICRA context. *See Settler v. Yakima Tribal Court* ("*Settler I*"), 419 F.2d 486, 489–90 (9th Cir. 1969), *abrogated by Santa Clara Pueblo*, 436 U.S. 49, and *Hensley v. Mun. Court*, 411 U.S. 345 (1973), *as recognized by Moore v. Nelson*, 270 F.3d 789, 791–92 (9th Cir. 2001); *Tracy v. Superior Court*, 810 P.2d 1030, 1049 (Ariz. 1991) (en banc). In both cases, the courts noted that a person subjected to a fine only is under "detention" for purposes of § 1303, even though a fine alone would not bring that person within the jurisdiction of the general federal habeas statutes.[5] Thus *Poodry* reined in the meaning of "detention" to the outer limits of "custody," but it did not suggest that "detention" was any *narrower* than "custody." *Poodry* provides no support for the majority opinion's novel holding that an American Indian may be in

---

[5] *See, e.g.*, *Bailey v. Hill*, 599 F.3d 976, 979 (9th Cir. 2010) ("We have repeatedly recognized that the imposition of a fine, by itself, is not sufficient to meet [28 U.S.C.] § 2254's jurisdictional requirements.").

"custody" for purposes of the general habeas statutes, but not in "detention" for purposes of the ICRA's habeas statute.

We actually have binding precedent to the contrary, which the majority opinion fails to acknowledge. It is the law of our Circuit that "[t]he term 'detention' in the [ICRA] statute must be interpreted similarly to the 'in custody' requirement in other habeas contexts." *Jeffredo*, 599 F.3d at 918; *see also Boozer v. Wilder*, 381 F.3d 931, 934 n.2 (9th Cir. 2004) ("Detention [as used in 25 U.S.C. § 1303] is interpreted with reference to custody under other federal habeas provisions."); *Moore*, 270 F.3d at 791–92 (9th Cir. 2001) (relying on habeas cases interpreting custody to analyze detention under the ICRA); *cf. Mills v. Taylor*, 967 F.2d 1397, 1400 (9th Cir. 1992) (affirming a grant of habeas corpus, in part because the panel "conclude[d] that Congress intended no change in meaning when it substituted 'detention' for 'custody' [in 18 U.S.C. § 3585]").

Morever, the majority splits from every other federal appellate court to have addressed this question. The Second Circuit recognizes that "Congress appears to use the terms 'detention' and 'custody' interchangeably in the habeas context." *Poodry*, 85 F.3d at 891. The Tenth Circuit "read[s] the 'detention' language as being analogous to the 'in custody' requirement contained in 28 U.S.C. § 2241." *Dry v. CFR Court of Indian Offenses*, 168 F.3d 1207, 1208 n.1 (10th Cir. 1999); *see also Valenzuela v. Silversmith*, 699 F.3d 1199, 1203 (10th Cir. 2012); *Walton v. Tesuque Pueblo*, 443 F.3d 1274, 1279 n.1 (10th Cir. 2006). And the Sixth Circuit recognizes that "habeas claims brought under the Indian Civil Rights Act, 25 U.S.C. § 1303, are most similar to habeas actions arising under 28 U.S.C. § 2241," § 1303's "federal law analogue." *Kelsey v. Pope*, 809 F.3d 849, 854 (6th Cir.

2016), *cert. denied sub nom. Kelsey v. Bailey*, 137 S. Ct. 183 (2016).

## II.

Half a century ago, the Supreme Court made clear that a habeas petitioner is in "detention" or "custody" when she is subjected to severe restraints on liberty that need not rise to the level of physical confinement. The Court declared, "History, usage, and precedent can leave no doubt that, besides physical imprisonment, there are other restraints on a man's liberty, restraints not shared by the public generally, which have been thought sufficient in the English-speaking world to support the issuance of habeas corpus." *Jones*, 371 U.S. at 240. Ever since, the Court consistently has "very liberally construed the 'in custody' requirement for purposes of federal habeas." *Maleng v. Cook*, 490 U.S. 488, 492 (1989) (per curiam).[6] For our part, we faithfully have applied the Court's instructions to our cases, recognizing that a habeas petitioner need only show "that he is subject to a significant restraint upon his liberty" for our jurisdiction to obtain. *Wilson v. Belleque*, 554 F.3d 816, 822 (9th Cir. 2009).

---

[6] The Supreme Court's broad construction of the "custody" requirement reflects the wide scope of application that the writ has enjoyed for centuries. For example, William Blackstone explained that the writ is "efficacious . . . in all manners of illegal confinement." 3 William Blackstone, *Commentaries on the Laws of England* 131 (Univ. of Chicago Press 1979) (1768); *see also Ex parte McCardle*, 73 U.S. (6 Wall.) 318, 325–26 (1867) (characterizing the writ of habeas corpus as the judicial remedy for "every possible case of privation of liberty contrary to the National Constitution, treaties, or laws," the scope of which is so broad that it is "impossible to widen").

In determining whether a habeas petitioner is "in custody," the Supreme Court has "rel[ied] heavily on the notion of a physical sense of liberty—that is, whether the legal disability in question somehow limits the putative habeas petitioner's movement." *Williamson v. Gregoire*, 151 F.3d 1180, 1183 (9th Cir. 1998). In *Jones v. Cunningham*, the Supreme Court held that conditions of parole satisfied the custody requirement where the parolee was required to remain in a particular community, make periodic reports to a parole officer, and refrain from visiting certain places. 371 U.S. at 242–43. The Court also has held that an individual released on his own recognizance pending sentencing after conviction is "in custody" because he must appear at times and places ordered by the court and "cannot come and go as he pleases." *Hensley*, 411 U.S. at 351; *see also, e.g.*, *Justices of Boston Mun. Court v. Lydon*, 466 U.S. 294, 301 (1984). Similarly, we have held that a petitioner required to log "fourteen hours of attendance at an alcohol rehabilitation program" was "in custody" because the sentence required the petitioner's "physical presence at a particular place," which "significantly restrain[ed] [his] liberty to do those things which free persons in the United States are entitled to do." *Dow v. Circuit Court*, 995 F.2d 922, 922–23 (9th Cir. 1993) (per curiam).[7] In these instances, the petitioner was "in custody" for purposes of habeas jurisdiction because the restraints on his physical liberty were "not shared by the public generally." *Jones*, 371 U.S. at 240. It is clear that

---

[7] Likewise, in *Barry v. Bergen County Probation Department*, the Third Circuit held that court-ordered community service constituted "custody" because an "individual who is required to be in a certain place—or in one of several places—to attend meetings or to perform services, is clearly subject to restraints on his liberty not shared by the public generally." 128 F.3d at 161.

such restraints need not rise to the level of actual confinement for habeas jurisdiction to attach.[8]

As with "custody," the restraint on physical liberty is the essence of "detention" under the ICRA. Thus, in *Means v. Navajo Nation*, 432 F.3d 924 (9th Cir. 2005), we held that a petitioner was in "detention" for ICRA purposes when the conditions of pretrial release barred the petitioner from going within one hundred yards of his former father-in-law's home and required him to appear as scheduled before the trial court. *Id.* at 928 (citing *Lydon*, 466 U.S. at 300–02, and *Hensley*, 411 U.S. at 351–52). Similarly, in *Settler v. Lameer* ("*Settler II*"), 419 F.2d 1311, 1312 (9th Cir. 1969) (per curiam), we held that despite the lack of physical confinement, petitioners released on bail satisfied the ICRA's detention requirement. *See also Moore*, 270 F.3d at 791 ("Bail status clearly restricts liberty in a way that a purely monetary fine does not; the petitioner 'cannot come and go as he pleases.'" (quoting *Hensley*, 411 U.S. at 351)). Consistent with the Supreme Court's construction of the "custody" requirement under

---

[8] The majority cites *Preiser v. Rodriguez*, 411 U.S. 475, 484–85 (1973), for the proposition that physical confinement was once a prerequisite to habeas relief. Maj. Op. 16–17. Notwithstanding that it is now "well established that actual *physical* custody is not a jurisdictional prerequisite for federal habeas review," *Poodry*, 85 F.3d at 893 (citing *Jones*, 371 U.S. at 243), the circumstances of *Preiser* are not comparable to Tavares's banishment.

The *Preiser* petitioner was a state prisoner seeking release, which explains why the Court used "custody," "detention," and "physical confinement" interchangeably to describe Preiser's situation. *See* 411 U.S. at 483–87. Contrary to the majority's suggestion, the Court never intimated that "detention" was somehow a subset of "custody." To the contrary: if *Preiser*, a non-ICRA case, stands for anything, it is that "detention" and "custody" are interchangeable in habeas law.

federal habeas law, we have made physical liberty the focal point of our analysis of "detention" under the ICRA.

### III.

### A.

Banishment is a uniquely severe punishment. It does "more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence." *Poodry*, 85 F.3d at 897. Tavares's ten-year banishment is not "a modest fine or a short suspension of a privilege . . . but [rather] the coerced and peremptory deprivation of [her] membership in the tribe and [her] social and cultural affiliation." *Id.* at 895. For these reasons, "[b]anishment has generally been held to satisfy the 'in custody' requirement" of the general habeas laws. *Cohen's Handbook of Federal Indian Law* § 9.09, 780–81 (Nell Jessup Newton ed., 2012) ("Cohen's"). Whether under the law of our circuit or that of any other to consider the issue, Tavares's banishment places her in "custody"; thus, she is in "detention."

The majority asserts that three cases about the limits of detention under § 1303 inform its analysis: *Poodry v. Tonawanda Band of Indians*, 85 F.3d 874; *Shenandoah v. United States Department of Interior*, 159 F.3d 708 (2d Cir. 1998); and *Jeffredo v. Macarro*, 599 F.3d 913. But only one of these cases, *Poodry*, squarely addresses the legal principles animating this case. Neither *Shenandoah* nor *Jeffredo* pertains to banishment. To the contrary, they are explicitly *not* about banishment. The *Shenandoah* petitioners did "not allege[] that they were banished from the Nation, . . . or that defendants attempted in anyway [sic] to remove them from

[tribal] territory." 159 F.3d at 714. Similarly, the *Jeffredo* petitioners "ha[d] not been banished" and "[t]heir movements ha[d] not been restricted on the Reservation." 599 F.3d at 919. Only *Poodry*'s holding bears upon the case before us, and it supports a finding of jurisdiction over Tavares's petition.

In *Poodry*, several members of the Tonawanda Band of Seneca Indians filed a petition for habeas relief under 25 U.S.C. § 1303 after they were ordered permanently banished from the tribe. The petitioners had accused members of the Tonawanda Council of Chiefs of misusing tribal funds, suspending tribal elections, burning tribal records, and other misconduct. *Poodry*, 85 F.3d at 877–78. Several months later, the petitioners were accosted at their homes by groups of fifteen to twenty-five persons, summarily convicted of "treason," and issued orders of permanent banishment. *Id.* at 878–79. The orders read in part, "You are to leave now and never return. . . . [Y]our name is removed from the Tribal rolls, your Indian name is taken away, and your lands will become the responsibility of the Council of Chiefs. You are now stripped of your Indian citizenship and permanently lose any and all rights afforded our members. YOU MUST LEAVE IMMEDIATELY AND WE WILL WALK WITH YOU TO THE OUTER BORDERS OF OUR TERRITORY." *Id.* at 876 (alteration in original). When the petitioners refused to leave the reservation, they suffered continued harassment, were assaulted, and were denied electrical service to their homes and businesses. *Id.* at 878

The *Poodry* petitioners filed for writs of habeas corpus under § 1303, claiming they had been denied several rights guaranteed under Title I of the ICRA. *Id.* at 879. The Western District of New York dismissed their petitions for

lack of subject-matter jurisdiction, holding that banishment did not constitute "detention" for the purposes of § 1303. *Id*. The Second Circuit reversed, concluding that where a tribal member has been banished rather than imprisoned, "[T]he ICRA's habeas provision [nevertheless] affords the petitioners access to a federal court to test the legality of their 'convict[ion]' and subsequent 'banishment' from the reservation and . . . therefore [the district court] erred in dismissing the petitions for writs of habeas corpus on jurisdictional grounds." *Id.* (second alteration in original).[9]

---

[9] Decided twenty years ago, *Poodry* has since become the leading authority on banishment as a basis for federal habeas jurisdiction. *See* 1 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* § 8.2[d], 449 & 449 n.53 (6th ed. 2011) (citing *Poodry*, 85 F.3d at 894–96); Ryan Fortson, *Advancing Tribal Court Criminal Jurisdiction in Alaska*, 32 Alaska L. Rev. 93, 147 (2015) (characterizing *Poodry* as the "seminal case addressing banishment"); *see also* William C. Canby, Jr., *American Indian Law in a Nutshell* 419 (6th ed. 2015) (discussing *Poodry*).

Notwithstanding *Poodry*'s significance, the majority opinion selectively quotes from an article by Professor Patrice Kunesh criticizing *Poodry* in an attempt to discount *Poodry*'s persuasive value. *See* Maj. Op. 25 n.14. But Kunesh's problem was not that *Poodry* applied "jurisdictional prerequisites under federal habeas corpus laws" to "ICRA's habeas corpus provision," which is the issue before us. Patrice H. Kunesh, *Banishment as Cultural Justice in Contemporary Tribal Legal Systems*, 37 N.M. L. Rev. 85, 123. Rather, Kunesh's criticisms were aimed at "the reach of the court's decision to disenrollment actions;" the court's disregard for "tribal legal systems;" and the portions of *Poodry*'s holding that "extend[ed] far beyond federal habeas corpus jurisprudence," including to "potential and threatened restraints on an individual's liberty," general "harassment," and "interference" with the provision of utilities and health care services. *Id.* at 123–24. None of the targets of Kunesh's criticisms of *Poodry* is present in this case. And, of course, *Poodry* remains good law in the Second Circuit and persuasive authority in ours.

In particular, the Second Circuit held that the scope of § 1303 is equivalent to that of the general federal habeas statutes, and that therefore the petitioners' banishment orders satisfied the "detention" requirement of § 1303. *Id.* at 890–97. It follows from *Poodry* that Tavares's banishment also constitutes "detention" under the ICRA.

In contrast, *Jeffredo*, the only case until today to raise the scope of the meaning of the term "detention" in § 1303 before our Court, does not support the majority's holding. In *Jeffredo*, a tribe disenrolled several members "for failing to prove their lineal descent as members of the Tribe." 599 F.3d at 915. We held that the disenrollment of the petitioners, whose "movements [had] not been restricted on the Reservation," did not constitute "detention" under the ICRA. *Id.* at 919. Specifically, we noted that "[d]isenrollment does not mean that a person is banished from the [tribe's] Reservation," and that the habeas petitioners in that case "ha[d] not been banished from the Reservation." *Id.* at 916, 919. This case presents the inverse fact pattern: Tavares was not disenrolled from her tribe, but she has been banished—her movements are restricted on the reservation. *Jeffredo* was about membership, not physical liberty; this case is about physical liberty, not membership. Because *Jeffredo* is not a case about banishment, our decision to decline jurisdiction in that case does not govern us here. *See also Moore*, 270 F.3d at 790–91 (recognizing that a tribal member who was "subjected to a fine" but who "ha[d] not been excluded or otherwise restricted in his movements on the Reservation" was not in detention under the ICRA).

The majority opinion extends *Jeffredo* from disenrollment decisions to temporary exclusion orders because, according to the majority, the latter are merely "another expression of

[the tribe's] sovereign immunity to determine the makeup of the community."  Maj. Op. 25.  This reasoning sweeps too broadly and occludes the distinct driving principles behind *Jeffredo* and this case.

First, a tribe's decision to disenroll members based on their "lineal descent" implicates the "'tribe's right to define its own membership for tribal purposes,'" which "'has long been recognized as central to its existence as an independent political community.'" *Jeffredo*, 599 F.3d at 917–18 (quoting *Santa Clara Pueblo*, 436 U.S. at 72 n.32).  Here, because Tavares does not challenge any membership decision of her tribe, her petition does not raise *Jeffredo*'s animating concern of protecting "[a] tribe's right to define its own membership." *Id.* at 917; *see also Cohen's*, *supra*, at 175 n.25 (explaining that banishment and disenrollment must be analyzed differently, and "[w]here the tribe clearly separates the banishment and disenrollment decisions . . . only the former is reviewable under the Indian Civil Rights Act's habeas corpus provision").

Second, by emphasizing that "[d]isenrollment does not mean that a person is banished from the [tribe's] Reservation" and that a disenrolled tribe member's "movements have not been restricted," *Jeffredo* acknowledged that banishment inherently involves physical coercion that more severely restrains an individual's liberty, and thus is more likely to qualify as "detention."  599 F.3d at 916, 919.  Although the *Jeffredo* petitioners were denied access to a senior citizens' center, a health clinic, and a tribal school, we were careful not to equate "the denial of access to certain facilities" with banishment from the reservation.  *Id.* at 918–19.  And for good reason: denying an individual access to certain government facilities is a far cry from denying her access to

her homeland. Thus, *Jeffredo* undermines, rather than supports, the majority's determination that Tavares's banishment fails to satisfy the ICRA's "detention" requirement.[10]

## B.

Tavares is banned from "all Tribal properties and/or surrounding facilities." This total physical exclusion affects Tavares's daily life in many ways: she cannot walk her grandchildren to school, attend tribal meetings, ceremonies, and events, or join her family and friends for any purpose on tribal land. A former leader of the UAIC, she no longer can "participate in the ceremonies and events of the Tribe's culture and heritage." Instead, she "ha[s] had to sit outside the fence and look on, as if [she] were [a] criminal[] or untouchable[]."[11] Tavares has demonstrated a severe restraint on her liberty not shared by other members of the tribe, which satisfies her burden of showing that she is in "custody," and thus in "detention."

---

[10] *Jeffredo* also comports with federal habeas precedents holding that the revocation of certain privileges or licenses, without a concomitant restraint on an individual's physical liberty, does not satisfy the "custody" requirement of federal habeas jurisdiction. *See, e.g.*, *Lefkowitz v. Fair*, 816 F.2d 17, 19–21 (1st Cir. 1987) (revocation of medical license). *Jeffredo*'s analysis of disenrollment is likewise consistent with other courts' analysis of "[d]ignitary, reputation, 'moral,' or psychological harm," which generally are considered "noncustodial statuses." Hertz & Liebman, *supra*, at 451–53 & 452 n.66 (collecting cases).

[11] Here, "both parties submitted declarations in connection with the motion to dismiss, [and] because no evidentiary hearing was held we must accept [Tavares's] version of events as true for the purposes of establishing jurisdiction and surviving a 12(b)(1) motion." *Rhoades v. Avon Prods., Inc.*, 504 F.3d 1151, 1160 (9th Cir. 2007).

The majority makes much of the fact that Tavares was banished "only . . . temporarily." Maj. Op. 27. But the majority's opinion does not explain why the duration of Tavares's banishment is legally relevant in determining whether she is in "detention" for habeas purposes. The writ of habeas corpus addresses the *fact* of detention, not its duration. An individual restrained for a day has no more freedom during the period of restraint than another restrained for a year. Thus, habeas relief is available to a prisoner no matter the length of his sentence.

Even if the duration of Tavares's banishment were relevant in determining whether she is in "detention," the ten-year term of her banishment is sufficient to severely restrain her liberty. If fourteen hours of mandatory attendance at an alcohol rehabilitation program, *Dow*, 995 F.2d at 922, or five hundred hours of mandatory community service, *Barry*, 128 F.3d at 161–62, is long enough to severely restrain an individual's liberty, then surely ten years—more than eighty thousand hours—of banishment is, too. Moreover, Tavares is an elderly woman. A ten-year period of banishment may constitute much of the remainder of her lifetime.

Nor is it clear how "temporary" non-permanent banishment orders are within the UAIC. The case of Tavares's daughter, Angelina ("Angie") Rey, is instructive. According to Tavares, the tribe banished Rey for one year for "defamation." During her year of banishment, Rey was photographed "stepp[ing] into [the tribe's] casino briefly" and was "banished for another year with her per capita payments and all membership privileges suspended for a year." As a result, Rey "was evicted from her home and, without a home, was unable to regain custody of her[] children." Given

Tavares's advanced age and the UAIC's history of compounding "temporary" banishment orders, ten years of banishment is not a significantly less severe restraint on Tavares's liberty than if the banishment order were permanent.

## C.

Undisputedly, Congress had the authority to create federal jurisdiction over violations of the ICRA, and it chose habeas review as the vehicle for those claims. *Santa Clara Pueblo*, 436 U.S. at 56–58. Critically, "Congress' provision for habeas corpus relief, and nothing more, reflected a considered accommodation of the competing goals of preventing injustices perpetrated by tribal governments, on the one hand, and, on the other, avoiding undue or precipitous interference in the affairs of the Indian people." *Id.* at 66–67 (internal quotation marks omitted); *see also id.* at 67 ("Congress apparently decided that review by way of habeas corpus would adequately protect the individual interests at stake while avoiding unnecessary intrusions on tribal governments."). In enacting § 1303, Congress struck a balance between the protection of tribal sovereignty and the vindication of civil rights. Our job is not to alter that balance based on our own views about the competing values at stake. Rather, we ought simply to apply the standards of federal habeas law.

This is a responsibility that Congress explicitly delegated to the courts, and one for which we are uniquely suited and,

indeed, have a duty to perform.**[12]**  But the majority contends that tribes' authority to ban non-members from tribal land must mean that banishment orders cannot invoke habeas jurisdiction.  The majority claims that if banishment orders trigger jurisdiction under § 1303, under which the privilege of the writ of habeas corpus is "available to any person" detained by a tribe, then "any person" under a banishment order—including non-members of the tribe—would enjoy federal habeas review.  Because that cannot be the case, the majority concludes that the only way to reconcile the intrusion upon tribal sovereignty embodied by § 1303 is to bar from habeas jurisdiction *all* banishment orders, including whatever it is the majority means by "exclusion."

The majority's reading assumes too much.  Tribes' power to ban non-members from their land is rooted in their inherent power as separate sovereigns.  By contrast, tribes' power to ban tribal members from their land was explicitly "limit[ed]" and "modif[ied]" by Congress's use of its "plenary authority" to provide individual rights to American Indians and to establish a narrow mechanism of federal judicial review to protect those rights.  *Santa Clara Pueblo*, 436 U.S. at 56.

---

**[12]**  The Supreme Court has referred to "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976); *see also Cohens v. Virginia*, 19 U.S. 264, 404 (1821) ("It is most true that this Court will not take jurisdiction if it should not: but it is equally true, that it must take jurisdiction if it should.  The judiciary cannot, as the legislature may, avoid a measure because it approaches the confines of the constitution.  We cannot pass it by because it is doubtful. With whatever doubts, with whatever difficulties, a case may be attended, we must decide it, if it be brought before us. We have no more right to decline the exercise of jurisdiction which is given, than to usurp that which is not given.").

There is no particular reason why we must treat an order banning a tribal member who enjoys legitimate associations of kin, culture, tradition, and birthright to the tribe as equivalent to one banning a non-member with no such associations; indeed, for the purposes of § 1303, we ought not to. To so hold is to choose a blunt tool, even while more precise analytical instruments are available.

**D.**

The majority believes that by exercising habeas jurisdiction over Tavares's ten-year banishment, we "would create a perverse incentive for tribes to first disenroll and *then* banish a member" to avoid federal review of the temporary banishment. Maj. Op. 27. The true effect of the majority's decision is to render unnecessary that "two-step dance," Maj. Op. 27; all a tribe would need to do to evade federal review is to *temporarily* banish a member—whether for ten years or fifty, or longer. This creates a different "perverse incentive": to banish a member "temporarily"—say, for ten years—and then to extend the banishment, again "temporarily," perhaps for another ten, and so on. The majority opines that Tavares's requested remedy "runs counter to Congress's goal of 'strengthening the position of individual tribe members vis-à-vis the tribe' by enacting the ICRA," Maj. Op. 27 (quoting *Santa Clara Pueblo*, 436 U.S. at 62), but that is precisely backward. It is the majority's opinion that runs counter to and weakens that goal. The majority's decision makes the individual rights that Congress championed in the ICRA dependent upon the whims of the tribe and hands the tribe the tool by which it can evade our habeas review—the only relief that the individual tribal member has against arbitrary or retaliatory violations of her ICRA rights.

**IV.**

Balancing individual civil rights against the importance of tribal sovereignty, Congress in 1968 decided that the doors of the federal courts are open to American Indians claiming unlawful and significant restraints on their liberty by their tribes. It is not for us to adjust the lines that Congress has drawn based on our own personal views of where the limits should be drawn. Despite Congress's instruction to the contrary, the majority denies Tavares the opportunity to challenge her detention in our courts. I respectfully dissent.